J-S37020-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| FRANKLIN EDUARDO RIVERA-MENDIETA | : | |
| | : | |
| | : | No. 1482 EDA 2023 |
| Appellant | : | |

Appeal from the Judgment of Sentence Entered November 29, 2022
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0002021-2020

BEFORE: BOWES, J., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY MURRAY, J.: **FILED NOVEMBER 5, 2024**

Franklin Eduardo Rivera-Mendieta (Appellant) appeals from the judgment of sentence entered following his conviction by a jury of two counts each of involuntary servitude, unlawful restraint, and terroristic threats; and one count each of corrupt organizations, trafficking in minors, criminal conspiracy (trafficking in minors), trafficking in individuals, rape by forcible compulsion, sexual assault, kidnapping, kidnapping of a minor, and sexual exploitation of children.[1] Appellant's counsel, Thomas D. Kenny, Esquire (Counsel), has filed a petition to withdraw from his representation of

---

[1] **See** 18 Pa.C.S.A. §§ 3012(a), 2902(a)(2), 2706(a)(1), 911(b)(3), 3011(b)(1), 3011(a)(1), 903, 3121(a)(1), 3124.1, 2901(a)(2), 2901(a.1)(2), 6320(a).

Appellant, and a brief pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009). After careful review, we grant Counsel's petition to withdraw and affirm Appellant's judgment of sentence.

In May 2020, the Malvern Pennsylvania Police Department received a report regarding the possible endangerment of a 14-year-old Maryland girl, A.M. On May 28, 2020, A.M.'s mother contacted East Whiteland Township Police Sergeant Patricia Doyle (Sgt. Doyle) and indicated that A.M. might be found at a local Wawa convenience store (Wawa) at 1:00 a.m.

During her surveillance of the Wawa, at around 1:20 a.m., Sgt. Doyle observed an SUV drive behind the Wawa. Once behind the Wawa, Sgt. Doyle saw a girl exit the SUV, dressed inappropriately for the weather. At Sgt. Doyle's request, the girl, A.M., entered Sgt. Doyle's police vehicle.

Police subsequently discovered that A.M. and another young woman, E.A., had been involuntarily held and forced to engage in sexual activities with paying customers. Police discovered that three men were engaged in the operation: Appellant, Dimas Hernandez (Hernandez), and Josue Sibrian Sanchez (Sanchez).

A.M. indicated that Appellant transported her, against her will, from Maryland to Malvern. A.M. indicated Appellant forced her to engage in sexual relations with him and other paying customers. During these activities, Appellant or Sanchez would collect payment from the customers. As a result,

- 2 -

Appellant, Hernandez, and Sanchez were arrested. Appellant was tried with Hernandez. Sanchez, who was awaiting sentencing following a guilty plea, testified at trial.

Following a jury trial, Appellant was convicted of the above-described charges. The trial court ordered a presentence investigation report. On November 29, 2022, the trial court sentenced Appellant to an aggregate prison term of 25-50 years and required him to register as Tier III sex offender under Subchapter H of the Sexual Offender Registration and Notification Act, 42 Pa.C.S.A. §§ 9799.10-9799.42. Appellant filed a post-sentence motion challenging, *inter alia*, the verdict as against the weight of the evidence. The trial court denied the post-sentence motion, after which Appellant filed the instant timely appeal.

The trial court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of matters complained of on appeal. However, in lieu of a Rule 1925(b) statement, Appellant's trial counsel, Thomas McCabe, Esquire (Attorney McCabe), filed a statement of his intention to file an ***Anders*** brief. ***See*** Pa.R.A.P. 1925(c)(4).

Attorney McCabe subsequently filed in this Court a petition to withdraw as Appellant's attorney and an ***Anders*** Brief. On January 18, 2024, this Court granted Attorney McCabe's petition to withdraw, based on his election to the Chester County Court of Common Pleas. The trial court directed the appointment of a new attorney for Appellant.

On February 2, 2024, the trial court appointed Counsel to represent Appellant. On May 6, 2024, Counsel filed in this Court a petition to withdraw and an *Anders* brief.

"When presented with an *Anders* brief, this Court may not review the merits of the underlying issue without first passing on the request to withdraw." *Commonwealth v. Garang*, 9 A.3d 237, 240 (Pa. Super. 2010) (citation omitted). Counsel seeking to withdraw from representation must

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the brief to the defendant; and 3) advise the defendant that he ... has the right to retain private counsel or raise additional arguments that the defendant deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*). Pursuant to *Santiago*, counsel must also

> (1) [p]rovide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Id.* (citing *Santiago*, 978 A.2d at 361). Once counsel has complied with these procedural requirements, we review the record and render an independent judgment as to whether the appeal is wholly frivolous. *Commonwealth v. Yorgey*, 188 A.3d 1190, 1197 (Pa. Super. 2018) (*en banc*).

- 4 -

Our review discloses Counsel properly notified Appellant of Counsel's intention to withdraw, and Appellant's right to secure new counsel or raise additional arguments *pro se*. The record further reflects that Counsel furnished Appellant with copies of his petition to withdraw and **Anders** brief.[2] The **Anders** brief summarizes the history of this appeal, and explains Counsel's reasons for concluding that the appeal is wholly frivolous. As Counsel has satisfied the procedural requirements of **Anders** and **Santiago**, we next review the record to determine whether Appellant's appeal is wholly frivolous.

Counsel's **Anders** Brief asserts the following issue: "Are there any non-frivolous issues preserved on appeal?" **Anders** Brief at 4 (capitalization modified). In the argument section of the **Anders** brief, counsel addresses issues challenging the sufficiency and weight of the evidence underlying the

---

[2] Counsel initially failed to attach to his petition a copy of a letter informing Appellant of his right to retain new counsel to pursue the appeal, proceed *pro se* on appeal, or raise any points Appellant deems worthy of the Court's attention. **See Commonwealth v. Harden**, 103 A.3d 107, 110 (Pa. Super. 2014) ("Counsel also must provide a copy of the **Anders** brief to the appellant. Attending the brief must be a letter that advises the appellant of his or her right to "(1) retain new counsel to pursue the appeal; (2) proceed *pro se* on appeal; or (3) raise any points that the appellant deems worthy of the court's attention in addition to the points raised by counsel in the **Anders** brief."); **Commonwealth v. Millisock**, 873 A.2d 748, 752 (Pa. Super. 2005) (opining that the prudent course is to require counsel to attach to the petition to withdraw a copy of the letter sent to the client advising of his or her rights). Counsel subsequently sent to this Court a copy of his letter to Appellant.

verdicts, and concludes any challenges thereto lack merit and are frivolous.

***See id.*** at 13-16.  Our review confirms Counsel's conclusions.

Regarding a challenge to the sufficiency of the evidence, our standard of review is well settled:

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense.  Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder.  The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.

***Commonwealth v. Juray***, 275 A.3d 1037, 1042 (Pa. Super. 2022) (quotation marks and citations omitted).

Appellant was convicted of two counts of involuntary servitude.  Crimes Code Section 3012 provides:

> **(a) *Offense defined. —*** A person commits a felony of the first degree if the person knowingly, through any of the means described in subsection (b), subjects an individual to labor servitude or sexual servitude, except where the conduct is permissible under Federal or State law other than this chapter.
>
> **(b) *Means of subjecting an individual to involuntary servitude. —*** A person may subject an individual to involuntary servitude through any of the following means:
>
>> **(1)** Causing or threatening to cause serious harm to any individual.
>>
>> **(2)** Physically restraining or threatening to physically restrain another individual.
>>
>> **(3)** Kidnapping or attempting to kidnap any individual.
>>
>> ….

- 6 -

**(5)** Taking or retaining the individual's personal property or real property as a means of coercion.

**(6)** Engaging in unlawful conduct with respect to documents, as defined in section 3014 (relating to unlawful conduct regarding documents).

….

**(9)** Criminal coercion, as defined in section 2906 (relating to criminal coercion).

**(10)** Duress, through the use of or threat to use unlawful force against the person or another.

**(11)** Debt coercion.

**(12)** Facilitating or controlling the individual's access to a controlled substance.

**(13)** Using any scheme, plan or pattern intended to cause the individual to believe that, if the individual does not perform the labor, services, acts or performances, that individual or another individual will suffer serious harm or physical restraint.

18 Pa.C.S.A. § 3012.

The crime of unlawful restraint is defined as follows: "[A] person commits a misdemeanor of the first degree if he knowingly… holds another in a condition of involuntary servitude." *Id.* § 2902(a)(2).

A person commits the crime of terroristic threats "if the person communicates, either directly or indirectly, a threat to … commit any crime of violence with intent to terrorize another[.]" *Id.* § 2706(a)(1).

The Crimes Code defines the crime of corrupt organizations, in part, as follows:

> It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

18 Pa.C.S.A. § 911(b)(3). Section 911 provides that racketeering activity includes crimes related to human trafficking. *Id.* § 911(h)(1)(i).

The crimes of trafficking in individuals and trafficking in minors are defined by the Crimes Code as follows:

> **(a) Offense defined.** A person commits a felony:
>
> > **(1)** of the first degree if the person recruits, entices, solicits, patronizes, advertises, harbors, transports, provides, obtains or maintains an individual if the person knows or recklessly disregards that the individual will be subject to sexual servitude;
>
> ….
>
> **(b) Trafficking in minors.** Notwithstanding section 1103 (relating to sentence of imprisonment for felony), a person shall be sentenced to a term of imprisonment fixed by the court at not more than 40 years if:
>
> > **(1)** the person violates subsection (a)(1) or (2); and
>
> > **(2)** the violation:
> >
> > > **(i)** results in a minor being subjected to sexual servitude; and
> >
> > > **(ii)** is part of a course of conduct subjecting minors to sexual servitude.

*Id.* § 3011(a)(1), (b)(1)-(2).

The Crimes Code further provides that

[a] person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

**(1)**   agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

**(2)**   agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

*Id.* § 903(a).

The Crimes Code defines the crime of rape as follows: "A person commits a felony of the first degree when the person engages in sexual intercourse with a complainant …[b]y forcible compulsion." *Id.* § 3121(a)(1).

Regarding sexual assault,

a person commits a felony of the second degree when that person engages in sexual intercourse or deviate sexual intercourse with a complainant without the complainant's consent.

*Id.* § 3124.1.

Regarding the crimes of kidnapping and kidnapping of a minor, Section 2901 of the Crimes Code provides, in relevant part, as follows:

**(a) Offense defined.—** Except as provided in subsection (a.1), a person is guilty of kidnapping if he unlawfully removes another a substantial distance under the circumstances from the place where he is found, or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following intentions:

….

   (2) To facilitate commission of any felony or flight thereafter.

….

> **(a.1) Kidnapping of a minor.** — A person is guilty of kidnapping of a minor if he unlawfully removes a person under 18 years of age a substantial distance under the circumstances from the place where he is found, or if he unlawfully confines a person under 18 years of age for a substantial period in a place of isolation, with any of the following intentions:
>
> ….
>
> (2) To facilitate commission of any felony or flight thereafter.

*Id.* § 2901(a)(2), (a.1)(2).

Finally, a person commits the offense of sexual exploitation of children "if he procures for another person a child under 18 years of age for the purpose of sexual exploitation." *Id.* § 6320(a).

With these definitions in mind, we review the evidence presented at trial, in a light most favorable to the Commonwealth. At trial, Fairfax County, Virginia, Police Officer Chase Briggs (Officer Briggs) testified that on May 17, 2020, he was assigned as a school resource officer. N.T., 8/16/21, at 206-07. At around 2:30 p.m., Officer Briggs received a call from a young lady (the confidential informant or CI), who reported

> that a friend of hers had been sending her some text messages that she was concerned about, and she wanted a police officer to do some sort of follow up with that. … [T]his [was] at the very beginning of the [] COVID pandemic, so a supervisor designated the call to be handled over the phone. So I then called the [CI]….

*Id.* Officer Briggs testified that he knew the CI was a minor. *Id.* at 208. He continued:

I questioned [the CI] as to why she had been contacting the police and what made her so worried to the point that she contacted the police to have her friend checked on.

*Id.* The CI provided Officer Briggs with A.M.'s phone number and location.

*Id.* at 209-10.

As a result of this information, Officer Briggs

put that location into GoogleMaps, looked up what township or county it was up [] in Pennsylvania. And then based on the other information that I was given by the [CI], … I felt that … a welfare check was necessary to be done on the [] party that [the CI] … called in about.

….

… I know the location was in … Malvern, Pennsylvania. So it was the jurisdiction of the police department that covers Malvern, Pennsylvania.

*Id.* at 210. According to Officer Briggs,

I spoke to a [local Pennsylvania] patrol officer that day about the department going out to do a welfare check, and then I spoke to that same officer after the welfare check was attempted.

*Id.* at 214. Officer Briggs testified that he

wrote up my report, and I sent a copy over to our gang intelligence unit. … I provided them with that information about that report that I had just taken.

*Id.*

Sgt. Doyle testified that she conducted the requested welfare check. Sgt. Doyle reviewed the GPS location "pin drop" provided from the potential victim's phone. *Id.* at 224. She explained:

Within our patrolman's report was information of a pin drop, which means, essentially, if you have the location services [feature

- 11 -

activated] … on your phone, … you can show people where you are. … You can pinpoint on a map – and that is why they call it a pin drop. It shows … a little red pin on a map….

*Id.* at 224-25. Sgt. Doyle continued:

So that particular street address is a little strip mall, and there's a car rental place in there, as well as a nail shop, a restaurant, and, I think, a mattress store.

….

There's a house, essentially, in a parking lot[ of] a car dealership. And then … sort of diagonally, there is a trailer park that has about 70 trailers in it.

*Id.* at 225. According to Sgt. Doyle, the "pin drop" was at either 486 or 487 Lancaster Avenue, in close proximity to the car rental business. *Id.* at 226-27. Sgt. Doyle confirmed that the house at that address is divided into residential units. *Id.* at 227.

Sgt. Doyle testified that,

because of the information I received in the police report that I read, there was an allegation of some gang … affiliation with this person we were looking for, so I had an associate at the time who specialized in gangs, and he was an agent for Homeland Security. So I called him.

*Id.* at 228. Sgt. Doyle additionally learned that "the person we were looking for, the person that dropped this pin[,] was a child by the name of [A.M.]" *Id.* at 229. At that time (May 2020), A.M. was 14 years old. *Id.* at 230-31.

On May 28, 2020, A.M.'s mother contacted Sgt. Doyle. *Id.* at 234. As a result of information received from A.M.'s mother, Sgt. Doyle contacted Homeland Security Agent Craig.[3] *Id.* According to Sgt. Doyle,

> I contacted Agent Craig from Homeland Security, and I said, let's meet at the Wawa at Lancaster Avenue and Planebrook Road in East Whiteland Township at midnight[,] because I think [A.M.] is going to be coming there at 1 a.m. … I didn't know how [A.M.] was getting there, who was bringing her, [or] where she was coming from, so I wanted help.

*Id.* (footnote added). The Wawa store was located within a couple of blocks from the car rental business -- "within walking distance." *Id.* at 235. Sgt. Doyle testified that she arranged for other patrol officers to accompany her in an unmarked vehicle. *Id.*

Sgt. Doyle testified that at around 1:20 a.m., Agent Craig reported a yellow sport utility vehicle (SUV) "pull[ed] out of a residence west of the Wawa within walking distance." *Id.* at 236. The SUV traveled along Lancaster Avenue and turned into the Wawa parking lot. *Id.* at 238. Sgt. Doyle observed that the SUV parked in a parking space near her unmarked vehicle. *Id.* at 239. Two adults emerged from the SUV, then reentered it and pulled out of the parking lot. *Id.*

The SUV next drove behind the Wawa, at which time Sgt. Doyle observed

> a girl get out of the back of the SUV and she looked upset. … [S]he was dressed inappropriately for the weather. She had on

---

[3] Agent Craig's first name is not stated in the testimony.

slippers, and then I saw an adult get out of the car, and they opened the back, and they were getting out … luggage, [including] a suitcase and a couple bags….

*Id.* at 239-40.  Sgt. Doyle testified:

So I get out of my car, and I'm not in a police uniform or anything….  I get out of my car, and [call out A.M.'s name.]  She turns, and she looks at me.  I was like, come here.  … [S]he was just looking at me.  I grabbed my badge, and I held it up, and I [stated], I'm here for your mom, come here, and she did.  She came over.  She was crying.  I told her to get in my car because it was raining, and I took her things from these people, and I put all of her things into my car.  I told her to stay in the car, and I quickly realized she didn't understand what I was saying because she didn't speak any English.

*Id.* at 240.

When Sgt. Doyle asked the individuals accompanying A.M. for identification, they did not provide the correct information.  *Id.* at 241.  These individuals stated that they saw A.M. walking along Lancaster Avenue and picked her up.  *Id.* at 242.

A.M. subsequently provided officers with two addresses where she had been held involuntarily.  *Id.* at 254.  Sgt. Doyle cooperated with a Chester County SWAT team and detectives to investigate two residences.  *Id.* at 245.  A.M. informed Sgt. Doyle that she was taken "from one to the other [residence] and that there was possibly another girl; at the one where [A.M.] was no longer staying."  *Id.*  During the course of the investigation, Sgt. Doyle learned that Appellant's co-defendant, Hernandez, lived at one of these residences.  *Id.* at 262.

- 14 -

A.M. testified that although she originally is from Guatemala, and lived there for seven years. N.T. 8/17/22, at 326. A.M. explained that in May 2020, she was 14 years old. *Id.* at 327. According to A.M., before traveling to Pennsylvania, she was living with a friend in Maryland, and her mother lived "close by to where I was living." *Id.* at 328.

A.M. testified that in May 2020, she

was at a hotel with two friends, and they told me that they were going to leave and go get a female friend.

….

So then they got back, and that's how I met [a woman named] Paola.

*Id.* at 328-29. A.M. went to a party with Paola, Paola's boyfriend, Selvin, and Selvin's friend, Christian. *Id.* at 329. After the party, A.M. exchanged SnapChat messages with Paola. *Id.* Paola asked A.M. "if I wanted to work." *Id.* Paola did not identify the type of job to A.M. *Id.* at 330. A.M. subsequently told Paola that "yes, I did want to work with her. And she said, okay, and that she would come pick me up." *Id.*

Paola and Appellant, who went by the alias, "Mono," picked A.M. up in Hyattsville, Maryland. *Id.* at 331; *see also id.* at 367-68 (A.M. identifying Appellant as Mono). A.M. explained:

Well, [Paola and Appellant] got there, and then she went with me to get my things. [Paola] accompanied me inside. The friend that I was living with there, he went inside. So I got my things. He stayed outside. And then my friend who I had been living with made some [hand] signs at [Paola]. She saw th[e hand signs] and returned them.

- 15 -

*Id.* According to A.M., she recognized the hand signs as gang signs from the MS-13 gang. *Id.* At the time, A.M. was not aware of her friend's gang affiliation. *Id.* at 331-32. A.M. testified that Paola returned a gang sign from "the 18th" street gang. *Id.* at 332.

A.M. testified that after the exchange of hand signs, a fight developed between her friend and Paola, and her friend "went to get a knife." *Id.* The fight ended when Appellant left to get the car. *Id.* at 333. A.M. testified that she was taken to a park with Appellant, Selvin and Christian: "They took me into a forest area, and they were hitting me for 16 seconds." *Id.* According to A.M., the men injured her on the side of her leg. *Id.* at 334. Appellant and Paola told A.M. she "could not go home." *Id.* As a result, A.M. testified, "I felt bad. I felt scared, and I wanted to go home." *Id.*

Appellant transported A.M. from Maryland to a residence in Malvern, Pennsylvania. *Id.* at 335. According to A.M., the next day, "we went to buy food at Walmart, and we got there, [Paola] told me to go buy something sexy to wear." *Id.* at 336. A.M. testified, "I told her that I didn't want to do anything like that and that I wanted to go home." *Id.* at 336-37. Paola indicated she would discuss the matter with Appellant. *Id.* at 337. When they returned to Appellant's residence, A.M. testified, "I wrote [at text message] to a [CI] and I told her that I was scared and that if anything happened, she should call the police." *Id.* A.M. testified that after she sent her friend the message, Paola "took my phone from me." *Id.* at 338. Paola

informed A.M. that A.M. must ask for permission to send her current address to anyone. *Id.* at 339.

A.M. testified that, the same day, a man named Adonis described her new "job" to her. *Id.* at 340. A.M. later identified Adonis as Appellant's co-defendant, Hernandez. According to A.M., Hernandez

> took me into the bedroom, and he told me he was going to show me how it was, how I should be, or how I should be with other clients.
>
> …
>
> Well, he took his pants down, and me made me touch his parts….

*Id.* at 340-41. A.M. explained that Hernandez made her touch her mouth to his penis. *Id.* at 341. A.M. testified Hernandez "told me I had to." *Id.* A.M. and Hernanzez "had sex in the bed." *Id.* A.M. explained she "was scared because I didn't want to do it, but [Hernandez] said I had to do it if I was going to be allowed to go home." *Id.* at 342. Thereafter, Paola and Hernandez took A.M.'s phone, and forced A.M. to send an audio message to the CI, "to tell her everything was okay and that it had all been a misunderstanding." *Id.* at 343. Afterwards, A.M. told Paola, Appellant, and Hernandez that she was 15 years old, although she was only 14 years old at the time. *Id.* at 344.

Appellant subsequently took A.M. to an apartment above a restaurant "to be with a customer." *Id.* at 345. A.M. went upstairs to the apartment, "and the guy was waiting for me up there." *Id.* According to A.M. the man paid money to Appellant. *Id.* A.M. described what next transpired:

I went in and took off my clothes. I took my clothes off. He took his clothes off, and he touched my vagina with his penis.

….

[The man] didn't say anything to me. He didn't talk to me, but [Appellant] – they told me that I had to be with the people, but that I shouldn't talk to them.

*Id.* at 346. A.M. went to that apartment twice. *Id.* at 347. According to A.M., she was told that "I had to do it or I wouldn't get to go home quickly." *Id.* However, Appellant and Paola told A.M. she would not be allowed to go home. *Id.* at 344. Afterwards, A.M. was told to bathe, because "we were going to see two more customers." *Id.* at 346.

Appellant and Paola took A.M. to a house to see two other clients. *Id.* While there, A.M. met with a man and a woman. *Id.* at 348. The three went into a bedroom, where A.M. "put my mouth on the woman's vagina[,]" and the man "touched me all over my chest." *Id.*

A.M. testified that she subsequently lived at that house with two men named Humberto and Sanchez. *Id.* at 349. A.M. testified that clients came to the residence every day. *Id.* at 355. According to A.M., in total, she interacted with five or six clients. *Id.* Each had to pay Sanchez. *Id.* Further, A.M. had to give any tips she received to Sanchez. *Id.* at 358. A.M. was told to tell clients that she is 22 years old and that her name is "Daniella." *Id.* at 355.

A.M. also testified regarding her use of a tablet computer. A.M. explained that she went into the bedroom of Humberto, to use his tablet. *Id.*

A.M. explained that she had requested help from Humberto, and told him she was "being forced to be there." *Id.* A.M. asked Humberto for his assistance to contact her mother. *Id.* Humberto "told me not right now, but that another day he could help me with that." *Id.* Humberto later loaned his tablet to A.M. to message her mother. *Id.* at 361. A.M. told her mother, "I didn't want to be here anymore." *Id.* Humberto also told A.M. he would buy her a telephone, "and leave it in a piece of furniture in his bedroom for me." *Id.* A.M. later contacted her mother using the telephone provided by Humberto. *Id.* However, when Appellant observed A.M. leaving Humberto's bedroom, he struck A.M. in the eye with his fist. *Id.* at 360.

A.M. testified that she and Humberto subsequently planned for A.M.'s escape:

> [Humberto] told me that the next day, he would go buy us all beers, and he was going to get everyone together there and that I should take advantage of that to escape.
>
> ….
>
> He told me to go out through his bedroom window.

*Id.* at 361-62. Humberto purchased beer the next day, at which time A.M. attempted to escape. *Id.* at 362. A.M. testified:

> I saw that everyone was in the living room, so I went into Humberto's bedroom. I grabbed the phone, and I went out through his bedroom window.
>
> ….
>
> I took off running, and when I turned around to look, I saw that [Appellant] was behind me.

- 19 -

….

     … [Appellant] told me that I had to go back, that I wasn't allowed to leave.  So I went back in through the window that I went out of because I thought he could take me somewhere else.

***Id.***  A.M. testified she feared Appellant would move her to another location.  ***Id.*** at 363.

Upon returning through the window, A.M. "asked Humberto to call the police.  And he said, no, it would be better if I told everyone who was there the truth."  ***Id.***  Humberto called Sanchez and two clients into the bathroom, at which time A.M. told them she was forced to be there and wanted to go home.  ***Id.***  The clients assisted A.M. with her suitcases and drove her to the Wawa store described above.  ***Id.*** at 364.  A.M. thought her mother would be at the Wawa waiting for her.  ***Id.*** at 365.

A.M. testified that Appellant had threatened A.M. not to tell clients of her circumstances, as they would report it back to Appellant.  ***Id.*** at 364.  A.M. also testified that Appellant once forced her to perform sex acts with Humberto.  ***Id.*** at 364-65.  A.M. indicated that Appellant once touched her vagina with his penis.  ***Id.*** at 364-65.  A.M. also testified that Appellant "told me there was … another girl" working for him.  ***Id.*** at 366.  That other girl "was at the first apartment where I had been."  ***Id.***

A.M. testified that Paola and Appellant took pictures of her with a telephone.  ***Id.*** at 366-67.  In those photos, A.M. wore only her underwear.  ***Id.*** at 367.  A.M. further testified that Appellant "told me once that if I wanted

- 20 -

to go back to Maryland, I'd have to kill my friend because he was a member of MS-13." *Id.* A.M. was told that if she joined the 18th Street gang, she would be allowed to leave. *Id.* at 383. A.M. was also told "I couldn't go home and that I should not try to escape." *Id.* at 389.

The Commonwealth also presented the testimony of E.A., another victim, who was born in November 2001. *Id.* at 391. E.A. testified that when she was 17 years old, she moved to the United States from El Salvador. *Id.* E.A. explained she moved in with her father, who was living in Virginia. *Id.* at 392.

E.A. testified that in 2020, she spoke with a friend named Kimberly through the application, SnapChat. *Id.* at 393. Kimberly stated she could help E.A. find work. *Id.* E.A. thereafter spoke with Appellant's co-defendant, Hernandez, on SnapChat. *Id.* at 394. According to E.A., "we started talking about the work, which was going to be working in a bar, and [Hernandez] also talked about a massage parlor." *Id.* At that time, E.A. did not have papers to work legally in the United States. *Id.* Although E.A. had requested a week to get her "affairs in order[,]" Hernandez sent someone to pick her up the next day. *Id.* at 395. Hernandez indicated that he "had everything all prepared. Like he had apartments where there were rooms that I could rent while I was going to work." *Id.*

E.A. testified that Appellant and Sanchez picked her up and, on February 17, 2020, transported her out of Virginia. *Id.* at 399. They took E.A. to an

apartment "where they sell cars[.]" *Id.* E.A. stated she waited at the apartment with Sanchez and another man. *Id.* at 400. According to E.A., she waited for her boss, Hernandez, to arrive. *Id.* Hernandez subsequently took E.A. shopping "to buy condoms and lube." *Id.* at 403. After leaving the store, Hernandez took E.A. to a hotel "to show me what the job was, what I had to do." *Id.* at 404.

At the hotel, Hernandez and E.A. began smoking marijuana. *Id.* at 405. Hernandez told E.A. to smoke a small, white rock "so that I could be able to speak well with him about what I was going to have to do." *Id.* E.A. testified, "[h]e said that he was going to show me what I was going to have to do with the clients." *Id.* Hernandez then "started to get naked." *Id.* at 406. Hernandez told E.A. to remove her clothing. *Id.* When asked why she complied, E.A. testified it was

> because I was just one person there with him. I didn't know what he might have on him. He always used to say that he would carry. He used to say that he was equipped. I didn't know what that meant. I didn't know if equipped meant that he carried a weapon or what. I didn't know.

*Id.* Hernandez then had sex with E.A. *Id.* E.A. expressly stated the sex was not voluntary. *Id.* at 407. E.A. testified, "I told him that … I didn't want to." *Id.* According to E.A., Hernandez responded, "I have to show you how because if I don't, then the clients could hurt you." *Id.* This scared E.A. *Id.* E.A. was also forced to engage in oral sex with Hernandez. *Id.* E.A. testified

this was not the type of work that she had agreed to perform in Pennsylvania. *Id.* at 408.

Hernandez brought E.A. back to the apartment. *Id.* E.A. testified that Appellant sometimes slept on a couch at the apartment. *Id.* at 409. Clients also came to that apartment. *Id.* E.A. testified that

> clients would send [Sanchez] a message that they were outside. They would come and wait at the door by the bathroom, and then he would give them a ticket, and they would come in.
>
> ….
>
> The ticket just had a time set limit on it, like 10 minutes, 20 minutes, 30 minutes, 40 minutes.

*Id.* at 416, 417. E.A. explained that the tickets were for sex with her. *Id.* at 420. Sanchez would keep track of the time and collect money from the clients. *Id.* at 417. According to E.A., when Hernandez "wasn't around, [Appellant] would take me." *Id.* at 421. E.A. testified that clients did not come to the apartment every day. *Id.* at 422. However, there would sometimes be ten or twelve clients at the apartment on a given day. *Id.* She also was taken to other apartments to meet with clients. *Id.* E.A. received no money for her work. *Id.* at 423. Hernandez collected the tickets and money once a week. *Id.*

E.A. told Hernandez she did not want to engage in sexual activities, but Hernandez replied, "You're already here; you're under my power." *Id.* at 418. E.A. testified that Hernandez discussed his membership in the 18th Street gang. *Id.* at 418-19. E.A. believed that Hernandez could harm her family

with one phone call. *Id.* at 420. Hernandez retained E.A.'s immigration paperwork. *Id.* at 426. E.A. was not permitted to leave the apartment on her own. *Id.* at 427.

E.A. also testified that Hernandez took her to a hotel and had sexual intercourse with her every day. *Id.* at 424. E.A. explained, Hernandez "would tell me he wanted to teach me new things so that I could keep the clients happy." *Id.* Hernandez with put his penis in her vagina, and "hit me in the face with his penis." *Id.* at 425. E.A. stated she did not wish to have sex with Hernandez. *Id.* E.A. stated that every day, she asked Hernandez if she could leave, and Hernandez replied, no. *Id.* at 433.

E.A. testified that Appellant also "wanted to be with me without paying and without me wanting to be with him. He wanted to abuse me that way." *Id.* According to E.A., Appellant once unsuccessfully tried to force himself sexually on her. *Id.*

E.A. also testified that Sanchez took naked photos of her to use for advertisements. *Id.* at 431. At one point, E.A. told Sanchez's friend, Raul, about her circumstances. *Id.* at 429. Raul offered to help E.A. *Id.* Raul bought alcohol "to get [Sanchez] and [Appellant] drunk[,]" after which they left the apartment. *Id.* at 430. E.A. and Raul went to Raul's house. *Id.* Hernandez eventually came to Raul's house and demanded $1,000 for removing E.A. from the apartment. *Id.* E.A. told Raul to refuse. *Id.*

According to E.A., Hernandez came to Raul's house almost every day to demand E.A.'s return or payment. *Id.* at 430-31.

Upon review of the evidence, in a light most favorable to the Commonwealth, we agree with Counsel's assessment that the evidence is sufficient to sustain Appellant's convictions and that a sufficiency challenge would be frivolous.

The above-stated evidence is sufficient to establish Appellant committed two counts of involuntary servitude, by subjecting A.M. and E.A. to sexual servitude. *See* 18 Pa.C.S.A. § 3012(a). The evidence further established Appellant committed two counts of unlawful restraint, by holding A.M. and E.A. in a condition of involuntary servitude. *Id.* § 2902(a)(2). Appellant further twice "communicated … a threat to … commit [a] crime of violence with intent to terrorize another[.]" *Id.* § 2706(a)(1). Regarding corrupt organizations, the evidence established Appellant engaged in a pattern of racketeering activity, by trafficking both A.M. and E.A. for involuntary sexual servitude. *Id.* § 911(b)(3), (h)(1). Appellant engaged in the trafficking of A.M., an individual and a minor, subjecting her to sexual servitude. *Id.* § 3011(a)(1), (b)(1)-(2).

The evidence sufficiently established Appellant conspired with Sanchez and Hernandez to secure the involuntary servitude of both A.M. and E.A. *Id.* § 3012(a). A.M.'s testimony established that Appellant committed the crime of rape by forcible compulsion. *Id.* § 3121(a)(1). A.M.'s testimony further

established Appellant kidnapped her, a minor, from Maryland to Pennsylvania to facilitate a felony. *Id.* § 2901(a)(2), (a.1)(2). Finally, the evidence established Appellant sexually exploited A.M. by forcing her to engage in sexual relations with paying customers. *Id.* § 6320(a).

The evidence further established Appellant knowingly subjected A.M. to involuntary sexual servitude, a violation of 18 Pa.C.S.A. § 3012(a). In particular, Appellant and his co-conspirators forced A.M. and E.A. to engage in sexual relations, while they received payment for the activities. Finally, the evidence established Appellant and his co-defendants engaged in a criminal conspiracy to traffic A.M. and E.A. *See id.* § 903(a). Upon review, we agree with Counsel's assessment that a challenge to the sufficiency of the evidence would lack merit and, under the circumstances presented, be frivolous.

Regarding a challenge to the weight of the evidence, we review a trial court's ruling on a challenge to the weight of the evidence for an abuse of discretion. *Commonwealth v. Banniger*, 303 A.3d 1085, 1095 (Pa. Super. 2023).

> The weight given to trial evidence is a choice for the factfinder. If the factfinder returns a guilty verdict, and if a criminal defendant then files a motion for a new trial on the basis that the verdict was against the weight of the evidence, a trial court is not to grant relief unless the verdict is so contrary to the evidence as to shock one's sense of justice.
>
> When a trial court denies a weight-of-the-evidence motion, and when an appellant then appeals that ruling to this Court, our review is limited. It is important to understand we do not reach the underlying question of whether the verdict was, in fact, against the weight of the evidence. We do not decide how we

would have ruled on the motion and then simply replace our own judgment for that of the trial court. Instead, this Court determines whether the trial court abused its discretion in reaching whatever decision it made on the motion, whether or not that decision is the one we might have made in the first instance.

Moreover, when evaluating a trial court's ruling, we keep in mind that an abuse of discretion is not merely an error in judgment. Rather, it involves bias, partiality, prejudice, ill-will, manifest unreasonableness or a misapplication of the law. By contrast, a proper exercise of discretion conforms to the law and is based on the facts of record.

*Id.* (citation omitted).

Upon review of the above-described evidence, we discern no abuse of the trial court's discretion in denying Appellant's post-sentence motion challenging the weight of the evidence. Such a challenge on appeal would lack merit and be frivolous, in light of the extensive evidence presented at trial.

Finally, our independent review discloses no non-frivolous issues that could be raised by Appellant. Accordingly, we grant Counsel's petition to withdraw, and affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/5/2024